*ACORN v. United States*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2009

Docket Nos. 09-5172-cv (L); 10-0992-cv (CON)

Argued: June 24, 2010                    Decided: August 13, 2010

_____

ACORN, ACORN INSTITUTE, INC., and MHANY MANAGEMENT, INC., f/k/a/ New York Acorn Housing Company, Inc.,

*Plaintiffs-Appellees*,

- v.-

UNITED STATES OF AMERICA, SHAUN DONOVAN, Secretary of the Department of Housing and Urban Development, PETER ORSZAG Director Office of Management and Budget, TIMOTHY R. GEITHNER JR., Secretary of the Department of Treasury of the United States, LISA P. JACKSON, Administrator of the Environmental Protection Agency, GARY LOCKE, Secretary of Commerce, and ROBERT GATES, Secretary of Defense,

*Defendants-Appellants*.

_____

Before:  MINER, CABRANES, and WESLEY, Circuit Judges.

Defendants-appellants appeal from a preliminary injunction entered on December 11, 2009, and a permanent injunction and declaratory judgment entered on March 10, 2010, in the United States District Court for the Eastern District of New York (Gershon, J.), declaring various appropriations laws unconstitutional bills of attainder and enjoining defendant from enforcing those laws against plaintiffs-appellees, the court having concluded that (1) the plaintiffs have Article III standing to challenge the appropriation laws against all of the defendants; and (2) the appropriations laws singling out plaintiffs from obtaining federal funds (a) fell within the historical meaning of legislative punishment, (b) did not further a non-punitive legislative purpose, and (c) were supported by a legislative record that evinced an intent to punish.

Affirmed in part, vacated in part, and remanded.

JULES LOBEL, Darius Charney, and William Quigley, Center for Constitutional Rights, Pittsburgh, PA and New York, NY; William Goodman and Julie Hurwitz, Goodman & Hurwitz, P.C., Detroit, MI; Arthur Schwartz, New York, NY, for plaintiffs-appellees.

MARK B. STERN, Michael S. Raab, Benjamin S.

Kingsley, and Helen L. Gilbert, Appellate Staff, Civil Division, U.S. Department of Justice (Tony West, Assistant Attorney General, Civil Division, U.S. Department of Justice; Benton J. Campbell, U.S. Attorney, Eastern District of New York), Washington, D.C. and Brooklyn, NY, for defendants-appellants.

Daniel R. Murdock, Patton Boggs LLP, New York, NY; Haaris Ahmad, Assistant Corporation Counsel, Wayne County, Michigan, Detroit, MI, for amicus curiae Wayne County, Michigan.

David B. Rankin and Mark Taylor, Rankin & Taylor, New York, NY, for amici curiae Alliance for Justice; Citizen Action of New York; Hakeem Jeffries; Labor Education & Research Project; Legal Aid Society of New York City; Marty Markowitz; Kevin Powell; Western States Center; and Jumaane D. Williams.

Mark D. Stern, Somerville, MA; John C. Philo, Maurice & Jane Sugar Law Center for Economic & Social Justice, Detroit, MI, for amici curiae United Electrical, Radio & Machine Workers of America; Communications Workers of America; Communications Workers of America Local 1180; Transport Workers Union of America; Transport Workers Union of America of Greater New York; Jobs with Justice; Interfaith Worker Justice; and Maurice & Jane Sugar Law Center for Economic & Social Justice.

Charles S. Sims and Anna G. Kaminska, Proskauer Rose LLP, New York, NY; Stephen I. Vladeck, Washington, D.C. for amici curiae Constitutional Law Professors Bruce Ackerman, Erwin Chemerinsky, David D. Cole, Michael C. Dorf, Mark Graber, Seth F. Kreimer, Sanford V. Levinson, Burt Neuborne, and Stephen I. Vladeck.

MINER, Circuit Judge:

Defendants-appellants, Shaun Donovan, Secretary of Housing and Urban Development ("HUD"); Peter Orszag, Director of the Office of Management and Budget ("OMB"); Timothy Geithner, Secretary of the Treasury; Lisa Jackson, Administrator of the Environmental Protection Agency ("EPA"); Gary Locke, Secretary of Commerce; Robert Gates, Secretary of

Defense; and the United States (collectively, the "government" or "defendants"), appeal from a preliminary injunction entered on December 11, 2009, and a permanent injunction and declaratory judgment entered on March 10, 2010, in the United States District Court for the Eastern District of New York (Gershon, J.).

Plaintiffs-appellees, Association of Community Organizations for Reform Now ("ACORN"), Acorn Institute , and New York Acorn Housing Company[1] ("New York Acorn" or, collectively with ACORN and Acorn Institute, the "plaintiffs") brought this action challenging provisions in several federal appropriations laws barring the distribution of federal funds to ACORN and its affiliates, subsidiaries, and allied organizations. The District Court struck down the challenged provisions, holding that (1) the plaintiffs have Article III standing to challenge the appropriations laws against all of the defendants, including the Secretary of Defense and the Director of OMB; and (2) the appropriations laws singling out ACORN and its affiliates from obtaining federal funds (a) fell within the historical meaning of legislative punishment, (b) did not further a non-punitive legislative purpose, and (c) were supported by a legislative record that evinced an intent to punish. Accordingly, the court enjoined the defendants from enforcing the challenged provisions of the appropriations laws.

## I.    BACKGROUND

### A.    The Plaintiffs

ACORN is a non-profit Arkansas corporation that organizes low- and moderate-income persons "to achieve social and economic justice." Specifically, ACORN has helped over two million people register to vote, advocated for increasing the minimum wage, worked against predatory lending, prevented foreclosures, assisted over 150,000 people file their tax returns, and "worked on thousands of issues that arise from the predicaments and problems of the poor, the homeless, the underpaid, the hungry and the sick." ACORN has 500,000 members located in 75 cities across the United States, with its national offices located in Brooklyn, New York,

---

[1] New York Acorn has recently changed its name to MHANY Management, Inc.

3

Washington, D.C., and New Orleans, Louisiana. ACORN has received 10% of its funding from the federal government and otherwise has received funding from various national and local sources.

Acorn Institute is a non-profit New Orleans corporation that has a "separate corporate existence from ACORN, with a separate board of directors and separate management." Acorn Institute, however, collaborates closely and contracts with ACORN to carry out many of the grants which Acorn Institute receives from, inter alios, the federal government. Similar to ACORN, Acorn Institute is involved with civil rights, employment, housing, and social-service issues of low-income communities. As of September 2009, Acorn Institute employed twenty employees, with its office located in New Orleans, Louisiana.

New York Acorn is a non-profit New York corporation that "owns, develops and manages housing affordable to low income families." New York Acorn controls over 140 buildings and 1,200 apartments located throughout the boroughs of New York City. New York Acorn is a separate entity from ACORN but is considered an ally or affiliate of ACORN.[2] New York Acorn receives part of its funds by way of subcontracting-grants from the New York State Housing Finance Agency, which, in turn, receives federal funds from HUD for such subcontracting purposes. New York Acorn employs an office staff of thirteen persons and a maintenance staff of twenty-four persons.

The legal and governance structure of ACORN and its "separate but interrelated components," such as Acorn Institute and New York Acorn, is "incredibly complex," and at one point the ACORN "[f]amily" was estimated at approximately 200 entities. As found in an internal report issued by ACORN in 2008, however, the ACORN family — which still included Acorn Institute and New York Acorn — had diminished to 29 entities by that time.

B.      Mismanagement, Fraud, and Congressional Response

---

[2] Following oral argument, HUD determined for purposes of its appropriations law that New York Acorn "is not an affiliate, subsidiary or allied organization of ACORN." Post-Argument Letter of the United States (dated July 8, 2010).

In 1999 and 2000, Dale Rathke, the brother of ACORN's founder Wade Rathke, embezzled nearly $1 million from the organization. Upon discovery of the embezzlement, "a small group of executives decided to keep the information from almost all of the group's board members and not to alert law enforcement." A restitution agreement was signed in which the Rathke family "agreed to repay[, beginning in 2001], the amount embezzled in exchange for confidentiality." In June 2008, however, a whistleblower forced ACORN to disclose the embezzlement, and at that time ACORN's mismanagement came under serious public scrutiny. ACORN immediately prepared an internal report noting, among other issues, "potentially improper use of charitable dollars for political purposes" as well as possible violations of federal law by ACORN and its "web" of nearly 200 affiliated organizations.

ACORN's reputation suffered further upon accusations of voter registration fraud, for which ACORN's workers had been convicted in prior years. Between October 2008 and May 2009, two more ACORN workers were charged with, and convicted of, voter registration fraud. While ACORN adopted "several good-governance policies" to address the problems identified in the internal report, a new scandal arose in the summer of 2009 when "hidden camera" videos revealed ACORN employees and volunteers providing advice and counseling in support of a proposed prostitution business.

In response to these events, ACORN commissioned an independent report to analyze "the videos that caused this summer's uproar" and "the entire organization, its core weaknesses and inherent strengths." The report, referred to as the "Harshbarger Report" because it was prepared by Scott Harshbarger, cited many of the problems of management previously noted in the internal report issued in 2008. Although the Harshbarger Report revealed that the hidden-camera videos were heavily edited, "manipulated," and "distorted," the report nonetheless criticized ACORN's "organizational and supervisory weakness" and overall failure to provide adequate organizational infrastructure necessary to manage and oversee its operations.

In September 2009, the U.S. Census Bureau and the Internal Revenue Service, both of

which collaborated with ACORN on certain programs, ended their relationship with ACORN due to its negative publicity. That same month, members of Congress asked the Government Accountability Office ("GAO") to initiate an investigation into ACORN's activities because "there remain[ed] significant concern that millions of taxpayer dollars were used improperly, and possibly criminally, by the organization." Several states suspended their funding of ACORN and its affiliates. In the State of Nevada, ACORN and two of its employees were charged with participating in an illegal voter registration scheme.

On October 1, 2009, Congress passed a "stop-gap" appropriations law to fund federal agencies prior to the enactment of the 2010 Fiscal Year appropriations. See Continuing Appropriations Resolution ("Continuing Resolution"), 2010, Pub. L. No. 111-68, Div. B, § 163, 123 Stat. 2023, 2053 (2009). Section 163 of the Continuing Resolution singled out ACORN as follows:

> None of the funds made available by this joint resolution or any prior Act may be provided to the Association of Community Organizations for Reform Now ACORN, or any of its affiliates, subsidiaries, or allied organizations.

Id. The provisions of the Continuing Resolution — including Section 163 — were set to expire on December 18, 2009. See Department of the Interior, Environment, and Related Agencies Appropriations Act, 2010, Division B — Further Continuing Appropriations, 2010, § 101, Pub. L. No. 111-88, 123 Stat. 2904, 2972 (2009).

In a memorandum dated October 7, 2009, the Director of OMB advised the heads of all executive agencies, inter alia, (1) that Section 163 prohibited them from providing any federal funds to ACORN and its affiliates, subsidiaries, and allied organizations during the period of the Continuing Resolution; (2) to suspend any existing contracts with ACORN and its affiliates "where permissible"; and (3) to take steps "so that no Federal funds are awarded or obligated by your grantees or contractors to ACORN or its affiliates as subcontractors, or other subrecipients." In a subsequent memorandum, the Office of Legal Counsel clarified that Section 163 would not prohibit funds to be paid pursuant to binding contractual obligations that predated

6

the exclusion.

C.    Entry of Preliminary Injunction and Subsequent Developments

On November 12, 2009, the plaintiffs commenced an action in the District Court to enjoin the United States, the Secretary of the Treasury, the Secretary of HUD, and the Director of OMB from enforcing Section 163.  In its complaint, the plaintiffs argued that the appropriations laws violated the First Amendment, the Due Process Clause, and the Bill of Attainder Clause.  The plaintiffs then moved for a preliminary injunction, which the court granted in an opinion and order filed on December 11, 2009, after concluding that the plaintiffs showed a likelihood of success on its bill-of-attainder claim.  The District Court did not address the plaintiffs' remaining First Amendment and due process claims.  In response to the District Court's ruling, the OMB rescinded its memorandum addressing the heads of all executive agencies on Section 163.  See OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, M-10-02, GUIDANCE ON SECTION 163 OF THE CONTINUING RESOLUTION REGARDING THE ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW (ACORN) (Oct. 7, 2009), available at http://www.whitehouse.gov/omb/assets/memoranda_2010/m10-02.pdf (last visited Aug. 10, 2010).

Meanwhile, Congress passed appropriations laws for fiscal year 2010, which President Obama signed into law.  See Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034 (2009); Department of Defense Appropriations Act, 2010, Pub. L. No. 111-118, 123 Stat. 3409 (2009).  One section of the appropriations laws used identical language to that of Section 163 and specifically excluded ACORN and its "affiliates, subsidiaries, and allie[s]" from federal funding.  Four sections of the appropriations laws similarly excluded ACORN and its "subsidiaries" from federal funding.[3]  In addition to the specific exclusion of ACORN from

---

[3] The Department of the Interior, Environment, and Related Agencies Appropriations Act of 2010, Pub. L. No. 111-88, Division A, Section 427; Consolidated Appropriations Act of 2010, Pub. L. No. 111-117, Division A, Section 418; Consolidated Appropriations Act of 2010, Pub. L. No. 111-117, Division B, Section 534; Consolidated Appropriations Act of 2010, Pub. L.

federal funding, the appropriations laws included Section 535, which directed the GAO to "conduct a review and audit of the Federal funds received by ACORN or any subsidiary or affiliate of ACORN" to determine

> (1) whether any Federal funds were misused and, if so, the total amount of Federal funds involved and how such funds were misused;
>
> (2) what steps, if any, have been taken to recover any Federal funds that were misused;
>
> (3) what steps should be taken to prevent the misuse of any Federal funds; and
>
> (4) whether all necessary steps have been taken to prevent the misuse of any Federal funds[.]

Commerce, Justice, Science, and Related Agencies Appropriations Act, 2010, Pub. L. No. 111-117, Div. B, § 535, 123 Stat. 3034, 3157–58 (2009). Section 535 required the GAO to submit its report "[n]ot later than 180 days after the enactment of this Act." Id. at 3158.

    D.    Declaratory Relief and Permanent Injunction

On consent of the government, the plaintiffs filed an amended complaint challenging the five sections of the latest appropriations laws, in addition to the by-then-expired Section 163. The amended complaint included the three remaining defendants in this appeal: the Administrator of the EPA; the Secretary of Commerce; and the Secretary of Defense.

In a judgment filed on March 10, 2010, the District Court granted the plaintiffs' request for declaratory relief and a permanent injunction. Specifically, the District Court held that the appropriations laws constituted unconstitutional bills of attainder; that the plaintiffs possessed standing to bring these claims against the named defendants; and that a permanent injunction was warranted in light of the unconstitutionality of the appropriations laws and the irreparable injuries suffered by the plaintiffs. As with its granting of the plaintiffs' motion for a preliminary injunction, the District Court again declined to reach the plaintiffs' First Amendment and due

---

No. 111-117, Division E, Section 511; and The Department of Defense Appropriations Act of 2010, Pub. L. No. 111-118, Division A, Section 8123.

process claims in light of its determination that the challenged laws were bills of attainder.

The government timely appealed the District Court's judgment, and we subsequently granted the government's motion to stay the injunction pending the appeal. On appeal, the government argues (1) that the plaintiffs lack standing against two of the defendants, namely, the Secretary of Defense and the Director of OMB, because the plaintiffs cannot show an actual injury that is fairly traceable to any current or anticipated actions by these two defendants; and (2) that the District Court erroneously determined the appropriations laws to be bills of attainder, because (a) the challenged laws are not congruent with any historical understanding of punishment; (b) the challenged laws do not constitute punishment as a functional matter; and (c) the legislative record does not evince an unmistakably punitive purpose.

## II. DISCUSSION

### A. Standard of Review

We review a district court's grant of a permanent injunction for abuse of discretion. Reynolds v. Giuliani, 506 F.3d 183, 189 (2d Cir. 2007). A district court abuses its discretion "when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions." Kickham Hanley P.C. v. Kodak Ret. Income Plan, 558 F.3d 204, 209 (2d Cir. 2009) (internal quotation marks omitted). Our review of questions of law is de novo. See, e.g., Spiegel v. Schulmann, 604 F.3d 72, 76 (2d Cir. 2010); Ascencio-Rodriguez v. Holder, 595 F.3d 105, 110 (2d Cir. 2010); Donk v. Miller, 365 F.3d 159, 164 (2d Cir. 2004).

### B. Standing to Sue the Secretary of Defense and the Director of OMB

The jurisdiction of the federal courts is limited to the resolution of "cases" and "controversies." U.S. Const. art. III, § 2. The corollary of this restriction is that the challenging party must have "standing" to pursue its case in federal court. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). Standing is established where (1) the challenging party

9

has "suffered an 'injury in fact' — an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, rather than conjectural or hypothetical"; (2) there is "a causal connection between the injury and the challenged conduct"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Gully v. Nat'l Credit Union Admin. Bd., 341 F.3d 155, 160–61 (2d Cir. 2003) (internal quotation marks omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." Id. at 161.

The government challenges the plaintiffs' standing to sue the Secretary of Defense and the Director of OMB. The government argues that, unlike the other defendants in this appeal, the plaintiffs have never received — and do not intend to apply for — grants or contracts from the Department of Defense. The government also argues that the plaintiffs have not suffered any injury caused by OMB because Section 163 is no longer effective; OMB rescinded its memorandum advising the heads of all the executive agencies; and, in any event, OMB has no authority to enforce federal statutes.

The plaintiffs cannot be said to lack standing to sue a government agency constrained to enforce a law that specifically names ACORN and prevents the plaintiffs from receiving federal funds. Cf. Foretich v. United States, 351 F.3d 1198, 1213 (D.C. Cir. 2003) (holding that plaintiff had standing to challenge as a bill of attainder a statute that deprived him of his child visitation rights — even though his child was eighteen and the statute no longer had any effect on his right to see her — because "Congress's act of judging [Foretich] and legislating against him on the basis of that judgment . . . directly give[s] rise to a cognizable injury to his reputation"); see also 5 U.S.C. § 702 (when enjoining the United States for agency actions, the court is required to name all officials who are responsible for compliance with the injunction). Even if the plaintiffs are not and never will be interested in applying for grants or funding from the Department of Defense, the fact that the defense department's appropriations law specifically prohibits ACORN and its affiliates from being eligible for federal funds affects the plaintiffs' reputation with other

10

agencies, states, and private donors.  See Gully, 341 F.3d at 162 ("The Supreme Court has long recognized that an injury to reputation will satisfy the injury element of standing.").

The government's argument that the plaintiffs lack standing to sue the Director of OMB is similarly misplaced.  Although the government asserts that OMB has no authority to enforce federal statutes, OMB "oversee[s] the execution" of the federal budget and has a continuing responsibility to explain appropriations provisions to agencies.  See U.S.C.A. Reorg. Plan 2 1970, 84 Stat. 2085, as amended by Pub. L. No. 97-258, § 5(b), 96 Stat. 1068, 1085 (1982) (stating that the OMB performs the "key function of assisting the President in the preparation of the annual Federal budget and overseeing its execution").  See generally id. ("While the budget function remains a vital tool of management, . . . [t]he new Office of Management and Budget will place much greater emphasis on the evaluation of program performance . . . [and] expand efforts to improve interagency cooperation.").  To that end, OMB's now-rescinded memorandum — which is the basis for the plaintiffs' claim of reputational injury with respect to Section 163 — was issued.  As explained by the District Court, notwithstanding the rescission of the OMB memorandum and expiration of Section 163, the OMB memorandum continues to exert influence over the plaintiffs' reputation:

> Following [the District Court's entry of a preliminary injunction], OMB did send an email to all federal agencies' general counsels informing them of the injunction entered . . . and that the government was considering appeal, but OMB did not direct them to inform their agencies, grantees, and grantees' subcontractors of this court's ruling.  The reputational harm, therefore, continues, as the original advice from OMB to the hundreds, if not thousands, of recipients of that advice has never been rescinded.

Indeed, the OMB memorandum providing guidance for application of Section 163 is still available on OMB's website.  See OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, M-10-02, GUIDANCE ON SECTION 163 OF THE CONTINUING RESOLUTION REGARDING THE ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW (ACORN) (Oct. 7, 2009), available at http://www.whitehouse.gov/omb/assets/memoranda_2010/m10-02.pdf (last visited Aug. 10, 2010).  Although the website states that the memorandum has been rescinded, there is

11

also a notation that "the enacted restrictions on funding ACORN and affiliates . . . remain in force" in light of this Court's granting the government's motion for a stay pending appeal. OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, MEMORANDA 2010, http://www.whitehouse.gov/omb/memoranda_default/ (last visited Aug. 10, 2010). Thus, what is called a rescission in fact functioned in no such way. In light of OMB's actual and continuing responsibility to oversee the management of the budgets of Executive Branch agencies, and its consequent impact on the plaintiffs' reputation, the plaintiffs have shown sufficient injury to bring suit against the Director of the OMB.

We therefore affirm the judgment of the District Court with regard to the issue of standing.

### C. Bill of Attainder

The Constitution prohibits the enactments of "bills of attainder." See U.S. Const. art. I, § 9 (prohibiting Congress); id. § 10 (prohibiting states). Historically, a bill of attainder

> was a device often resorted to in sixteenth, seventeenth and eighteenth century England for dealing with persons who had attempted, or threatened to attempt, to overthrow the government. In addition to the death sentence, attainder generally carried with it a "corruption of blood," which meant that the attainted party's heirs could not inherit his property. The "bill of pains and penalties" was identical to the bill of attainder, except that it prescribed a penalty short of death, e.g., banishment, deprivation of the right to vote, or exclusion of the designated party's sons from Parliament. Most bills of attainder and bills of pains and penalties named the parties to whom they were to apply; a few, however, simply described them. While some left the designated parties a way of escaping the penalty, others did not.

United States v. Brown, 381 U.S. 437, 441–42 (1965) (footnotes omitted).

The scope of the Bill of Attainder Clause, however, has been interpreted as wider than the historical definition of a "bill of attainder." See Matter of Extradition of McMullen, 989 F.2d 603, 606–07 (2d Cir. 1993) (en banc) ("[T]he Bill of Attainder Clause broadly . . . prohibit[s] bills of pains and penalties as well as bills of attainder."); South Carolina v. Katzenbach, 383 U.S. 301, 324 (1966) (stating that the Bill of Attainder Clause provides "protections for individual persons and private groups"); Brown, 381 U.S. at 442 (stating that the

12

Constitution's prohibition against bills of attainder "was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply — trial by legislature").  Indeed, it can be said that the broadness of the American prohibition of bills of attainder under Article I, section 9 is more a reflection of the Constitution's concern with fragmenting the government power than merely preventing the recurrence of unsavory British practices of the time.  See generally Roger J. Miner, Identifying, Protecting and Preserving Individual Rights: Traditional Federal Court Functions, 23 SETON HALL L. REV. 821, 826–30 (1992–1993) (discussing bills of attainder).

In its contemporary usage, the Bill of Attainder Clause prohibits any "law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial."  Selective Serv. Sys. v. Minn. Pub. Interest Research Grp., 468 U.S. 841, 846–47 (1984).  That is, the Supreme Court has identified three elements of an unconstitutional bill of attainder: (1) "specification of the affected persons," (2) "punishment," and (3) "lack of a judicial trial."  Id. at 847.  Although the Supreme Court has never had occasion to rule on the issue, we have held that the scope of the "specification of the affected persons" element includes corporate entities.  See Con. Edison Co. of N.Y., Inc. v. Pataki, 292 F.3d 338, 349 (2d Cir. 2002) ("We therefore hold that corporations must be considered individuals that may not be singled out for punishment under the Bill of Attainder Clause." (internal quotation marks, alteration, and citation omitted)).

With respect to the existence vel non of punishment, three factors guide our consideration: (1) whether the challenged statute falls within the historical meaning of legislative punishment (historical test of punishment); (2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes" (functional test of punishment); and (3) whether the legislative record "evinces a [legislative] intent to punish" (motivational test of punishment).  Selective Serv. Sys., 468 U.S.

at 852. All three factors need not be satisfied to prove that a law constitutes "punishment"; rather, "th[e] factors are the evidence that is weighed together in resolving a bill of attainder claim." Con. Edison, 292 F.3d at 350.

Because the government does not challenge the District Court's determination that the specificity and lack-of-judicial-trial elements are satisfied in this case, we focus on whether the laws constitute the type of "punishment" that runs afoul of the Bill of Attainder Clause.

1. Historical Test of "Punishment"

The Supreme Court has recognized that certain types of punishment are "so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably have been held to fall within the proscription of the [Bill of Attainder Clause]." Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 473 (1977). "The classic example is death, but others include imprisonment, banishment, the punitive confiscation of property, and prohibition of designated individuals or groups from participation in specified employments or vocations." Con. Edison, 292 F.3d at 351 (internal quotation marks, alteration, and ellipsis omitted). A familiar theme in these classic examples of punishment is the initial determination by the legislature of "guilt." See De Veau v. Braisted, 363 U.S. 144, 160 (1960) ("The distinguishing feature of a bill of attainder is the substitution of a legislative for a judicial determination of guilt.").

Here, the plaintiffs analogize the appropriations laws to the "cutoff of pay to specified government employees held to constitute punishment for purposes of the Bill of Attainder Clause [in United States v. Lovett, 328 U.S. 303, 317–18 (1946)]." In the plaintiffs' view, that the appropriations laws do not constitute a permanent ban or disqualification of ACORN from federal funds is immaterial because "the consequences of even a temporary ban on government funding for government contractors can be potentially harsh." Moreover, the plaintiffs argue that the appropriations laws precluding ACORN from receiving federal funds, despite having an expiration date, could be renewed every year and therefore constitute a de facto permanent ban.

The withholding of appropriations, however, does not constitute a traditional form of

14

punishment that is "considered to be punitive per se." See Con. Edison, 292 F.3d at 351. Congress's decision to withhold funds from ACORN and its affiliates constitutes neither imprisonment, banishment, nor death. The withholding of funds may arguably constitute a punitive confiscation of property at some point, but the plaintiffs do not assert that they have property rights to federal funds that have yet to be disbursed at the agency's discretion. We note, further, that "[t]here may well be actions that would be considered punitive if taken against an individual, but not if taken against a corporation." Id. at 354. In comparison to penalties levied against individuals, a temporary disqualification from funds or deprivation of property aimed at a corporation may be more an inconvenience than punishment. While ACORN claims that it will be "drive[n] close to bankruptcy" and may suffer a "corporate death sentence" without federal funds, the Harshbarger Report reveals that ACORN only derives 10% of its funding from federal grants. Thus, we doubt that the direct consequences of the appropriations laws temporarily precluding ACORN from federal funds are "so disproportionately severe" or "so inappropriate" as to constitute punishment per se. See Nixon, 433 U.S. at 472 ("Forbidden legislative punishment is not involved merely because the Act imposes burdensome consequences.").

As asserted by the plaintiffs, the appropriations laws "attaint ACORN with a note of infamy . . . [and] encourage others to shun ACORN." But the plaintiffs are not prohibited from any activities; they are only prohibited from receiving federal funds to continue their activities. Although the appropriations laws may have the effect of alienating ACORN and its affiliates from their supporters, Congress must have the authority to suspend federal funds to an organization that has admitted to significant mismanagement. The exercise of Congress's spending powers in this way is not "so disproportionately severe and so inappropriate to nonpunitive ends" as to invalidate the resulting legislation as a bill of attainder. See Nixon, 433 U.S. at 473; cf. Sabri v. United States, 541 U.S. 600, 605 (2004) ("Congress has authority under the Spending Clause to appropriate federal moneys to promote the general welfare, and it has corresponding authority under the Necessary and Proper Clause to see to it that taxpayer dollars

15

appropriated under that power are . . . not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars." (internal citations omitted)). And, in any event, according to the plaintiffs, at least one state that had previously suspended funding to the plaintiffs has restored funding to New York Acorn. See 28(j) Letter on Behalf of ACORN (dated June 22, 2010). Thus, the plaintiffs' claim of alienation — that is, their claim that they have been tainted with "a note of infamy" — is not as severe as the plaintiffs assert.

Of course, as discussed in more detail infra Analysis II(B)(3) (Motivational Test of Punishment), there is some evidence in the record indicating that ACORN was precluded from receiving federal funds upon the legislature's determination that ACORN was guilty of abusive and fraudulent practices. This evidence points in the direction of a traditional form of punishment. See De Veau, 363 U.S. at 160. "The fact that the punishment is inflicted through the instrumentality of an Act specifically cutting off the pay of certain named individuals found guilty of disloyalty, makes it no less galling or effective than if it had been done by an Act which designated the conduct as criminal." Lovett, 328 U.S. at 316. Nonetheless, despite statements about ACORN's guilt on the legislative floor, the appropriations laws themselves do not mention ACORN's guilt in any way. Cf. Con. Edison, 292 F.3d at 344 (the challenged law expressly found that Consolidated Edison had failed "to exercise reasonable care"). Moreover, unlike Lovett, here, there was no congressional "trial" to determine ACORN's guilt. Cf. Lovett, 328 U.S. at 310–12 (involving a secret congressional trial for engaging in subversive Communist activities, with the suspected Communists allowed to testify in their defense). As the Supreme Court noted in Flemming v. Nestor, 363 U.S. 603, 617–19 (1960), where a court is left only with the legislative history of a law that is impugned as a bill of attainder, there must be "unmistakable evidence of punitive intent [in the legislative history] . . . before a Congressional enactment of this kind may be struck down." Although there is some evidence of a determination of guilt in the legislative history of the appropriations laws, for the reasons stated

16

infra Analysis II(B)(3) (Motivational Test of Punishment), there is not "unmistakable evidence" of congressional intent to punish within the contemplation of the Bill of Attainder Clause. We therefore find no basis for drawing the conclusion that the challenged appropriations laws constitute "punishment" as it was historically understood.

## 2. Functional Test of Punishment

The functional test of punishment looks to whether the challenged law, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." Nixon, 433 U.S. at 475. "It is not the severity of a statutory burden in absolute terms that demonstrates punitiveness so much as the magnitude of the burden relative to the purported nonpunitive purposes of the statute." Foretich, 351 F.3d at 1222. Thus, "[a] grave imbalance or disproportion between the burden and the purported nonpunitive purpose suggests punitiveness, even where the statute bears some minimal relation to nonpunitive ends." Id.; accord Con. Edison, 292 F.3d at 350 ("Where a statute establishing a punishment declares and imposes that punishment on an identifiable party . . . we look beyond simply a rational relationship of the statute to a legitimate public purpose for less burdensome alternatives by which the legislature could have achieved its legitimate nonpunitive objectives." (internal quotation marks, ellipsis, and alterations omitted)).

Initially, the plaintiffs appear to suggest that the appropriations laws are presumptively unconstitutional bills of attainder because they specifically named ACORN for exclusion from federal funds. But Congress may single out an entity or person in its legislation. See Nixon, 433 U.S. at 469–72 (rejecting the argument that "the Constitution is offended whenever a law imposes undesired consequences on an individual or on a class that is not defined at a proper level of generality"); Con. Edison, 292 F.3d at 350 ("A legislature may legitimately create a 'class of one' for many purposes."). Although the specific naming of ACORN in the appropriations laws satisfies one classic mark of a bill of attainder — and is certainly relevant in assessing the plausibility of the alleged punitive purposes of the challenged law, see Foretich,

17

351 F.3d at 1224 — such specificity does not create a presumption of unconstitutionality. Because the party challenging a congressional law as an unconstitutional bill of attainder bears the burden of proof, see Con. Edison, 292 F.3d at 350 ("The party challenging the statute has the burden of establishing that the legislature's action constituted punishment and not merely the legitimate regulation of conduct." (internal quotation marks and alteration omitted) (emphasis added)), we accord no presumption that the appropriations laws specifying ACORN for exclusion constitute bills of attainder.

With respect to the non-punitive purpose for the appropriations laws, the government argues that Congress was motivated by its desire to "ensur[e] the effective expenditure of taxpayer dollars." According to the government, the appropriations laws at issue here "provide a temporary response to incontrovertible evidence of mismanagement by organizations that are part of a complex, poorly-managed family of organizations, pending the findings of ongoing investigations." While acknowledging that Congress has a legitimate interest in ensuring the proper use of taxpayer money, the plaintiffs argue that the specificity of the affected parties, the uniqueness of the congressional action, and the breadth of restrictive action in this case render the appropriations laws disproportionately severe and thus "punitive" under the functional test of punishment. Specifically, the plaintiffs argue: (1) Congress singled out ACORN for exclusion despite other contractors having similar problems with mismanagement; (2) the appropriations laws, which affect ACORN and its affiliates, subsidiaries, and even allied organizations, is "clearly overbroad" in relation to the laws' purported legitimate purposes; (3) the appropriations laws bypass existing regulations that address concerns about funding mismanaged organizations, such as ACORN; and (4) the appropriations laws unnecessarily preclude ACORN's obtaining federal funds for one year, regardless of the results of the GAO's investigation of ACORN's operations, i.e., even if the GAO concluded that ACORN was no longer plagued with mismanagement, the exclusion from federal funds would continue for the fiscal year.

We note that the plaintiffs' claim that the appropriations laws are punitive because they

18

single out ACORN is undermined by the plaintiffs' claim that the appropriations laws are also punitive because they affect hundreds of unnamed "allied" and "affiliated" organizations. If the appropriations laws affect such broad groups of organizations, then they are similar to a rule of general applicability and are less likely to have a punitive purpose. See, e.g., Flemming, 363 U.S. at 620 (rejecting claim that a law excluding certain deportees, i.e., criminal, subversive, or illegal, from receiving social security benefits was not a bill of attainder because the law affected "the great majority of those deported" and because there was not unmistakable evidence that the law had a punitive purpose); cf. Foretich, 351 F.3d at 1224 ("[N]arrow application of a statute to a specific person or class of persons raises suspicion, because the Bill of Attainder Clause is principally concerned with the singling out of an individual for legislatively prescribed punishment." (internal quotation marks, alteration, and emphasis omitted)). Indeed, because ACORN and its related entities make up such an amorphous and sprawling family of organizations — at one time consisting of approximately 200 entities governed by a structure that was "incredibly complex" — it was entirely reasonable for Congress to broadly exclude ACORN's affiliates, subsidiaries, and allies from federal funds, and leave it to the agencies to determine which organizations would be excluded to further the congressional purpose of protecting the public fisc from ACORN's admitted failures in management. See, e.g., Post-Argument Letter of the United States (dated July 8, 2010) (responding to the plaintiffs' post-argument submission by attaching an agency letter dated July 8, 2010, stating that HUD "has determined that [New York Acorn] is not an affiliate, subsidiary or allied organization of ACORN").

The plaintiffs' assertion that the appropriations laws are punitive because they bypass administrative procedures is also unpersuasive. Although a law that bypasses administrative procedures may "reinforce[]" the conclusion that the law was intended "to find guilt and order punishment directly," Con. Edison, 292 F.3d at 349, the same inference is difficult to draw when a congressional appropriations law is at issue. Cf. id. (finding violation of Bill of Attainder

19

Clause where the legislative act, which prohibited Consolidated Edison from recovering costs from its ratepayers, was aimed at the allocation of private funds). While withholding federal funds may constitute punishment in certain circumstances, a temporary ban on federal assistance to the groups at issue here — ACORN (which admitted to mismanagement and embezzlement and suffered numerous convictions of its workers), and Acorn Institute and New York Acorn (which were part of a complex web of interrelated entities with ACORN) — is not comparable to congressional acts of punishment such as permanent disqualification from a certain vocation or criminalizing past conduct. See, e.g., Brown, 381 U.S. at 455; Pierce v. Carskadon, 83 U.S. 234 (1872); Ex Parte Garland, 71 U.S. 333 (1867); Cummings v. Missouri, 71 U.S. 227 (1867); cf. Selective Serv. Sys., 468 U.S. at 853 (upholding law that withheld federal student assistance to men who had not registered for the draft); Flemming, 363 U.S. at 618–21 (upholding law that excluded certain deportees from receiving social security benefits). Compare Am. Commc'ns Ass'n, C.I.O. v. Douds, 339 U.S. 382, 413–15 (1950) (rejecting bill-of-attainder challenge against a law that required union officers to file affidavits — that they were not Communist Party members and that they did not favor the overthrow of the United States government by force or violence — in order to invoke the assistance and services of the NLRB), with Brown, 381 U.S. at 455 (declaring unconstitutional a law that made it a crime for a member of the Communist Party to serve as a union officer or manager).

Finally, we reject the plaintiffs' argument that the appropriations laws are punitive because they disqualify ACORN from federal funds even if the GAO investigation results in a favorable disposition for ACORN. Although there is no provision in the appropriations laws that ties the GAO investigation with ACORN's status to receive federal funds, Congress could, of course, modify the appropriations law following the GAO's investigation."[4] See BellSouth

<hr />

[4] A preliminary report issued by the GAO states that "the information in this report is preliminary and subject to change. We plan to issue a report later this year with our final results related to ACORN and potentially related organizations." U.S. GOV'T ACCOUNTABILITY OFFICE, WASHINGTON, D.C., PRELIMINARY OBSERVATIONS ON FUNDING, OVERSIGHT, AND INVESTIGATIONS AND PROSECUTIONS OF ACORN OR POTENTIALLY RELATED ORGANIZATIONS

Corp. v. FCC, 162 F.3d 678, 687 (D.C. Cir. 1998) (noting that even if there were alternate ways of fulfilling legitimate government interests, "it [is] up to the legislature to make this decision"). On the facts of this case, Congress's response is not so out of proportion to its purported non-punitive goal of protecting public funds from future fraud and waste so as to render the funding bans punitive in nature.

In sum, the plaintiffs have failed to show that the appropriations laws constitute "punishment" under the functional test.

### 3. Motivational Test of Punishment

The legislative record by itself is insufficient evidence for classifying a statute as a bill of attainder unless the record reflects overwhelmingly a clear legislative intent to punish. See Flemming, 363 U.S. at 617 ("[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on [the] ground [of legislative history.]"); see also Lovett, 328 U.S. at 308–12 (recounting extensive evidence of punitive intent in the legislative record). Statements by a smattering of legislators "do not constitute [the required] unmistakable evidence of punitive intent." Selective Serv. Sys., 468 U.S. at 856 n.15 (internal quotation marks omitted).

Here, as the plaintiffs argue, the legislative record reveals much concern about protecting the expenditure of taxpayer money against "waste, fraud, and abuse." 155 Cong. Rec. S9517 (daily ed. Sept. 17, 2009) (Senator Johanns); see also 155 Cong. Rec. S11313 (daily ed. Nov. 10, 2009). Senator Bond described the exclusion as necessary because of ACORN's "endemic and systemwide culture of fraud and abuse" and stated that Congress had "the opportunity to end this relationship now." 155 Cong. Rec. S9314 (daily ed. Sept. 14, 2009). Congressman Issa published an eighty-eight-page staff report that concluded that ACORN and organizations associated or allied with it constituted "a criminal enterprise" that had "repeatedly and deliberately engaged in systemic fraud" and "committed a conspiracy to defraud the United

(June 14, 2010), http://www.gao.gov/new.items/d10648r.pdf.

21

States by using taxpayer funds for partisan political activities." This report was read into the Congressional Record when one of the challenged appropriation laws was introduced. See 155 Cong. Rec. S9308, 9309–10, 9317 (daily ed. Sept. 14, 2009) (Senator Johanns) (describing ACORN as "besieged by corruption, by fraud, and by illegal activities, — all committed on the taxpayers' dime").

According to the plaintiffs, nearly ten members of the House of Representatives assailed ACORN as "this crooked bunch," "this corrupt and criminal organization," and being involved in "child prostitution," "shaking down lenders," "corrupting our election process," "trafficking illegal aliens," and being in the "criminal hall of fame," among other epithets and accusations. See 155 Cong. Rec. H9946–10129. There were also, however, representatives who opposed the exclusion of ACORN during these debates. For example, Senator Durbin stated: "[W]e are seeing in Congress an effort to punish ACORN that goes beyond any experience I can recall in the time I have been on Capitol Hill. We have put ourselves — with some of the pending amendments — in the position of prosecutor, judge and jury." 155 Cong. Rec. S10181, 10211 (daily ed. Oct. 7, 2009). Senator Leahy similarly protested the attack on ACORN: "Everyone — except perhaps many of the casual observers who are the target audience of the orchestrated anti-ACORN frenzy — knows that the score-at-any-price partisanship is being mixed in an unseemly way with public policy." 155 Cong. Rec. S9541–42 (daily ed. Sept. 17, 2009).

Despite the evidence of punitive intent on the part of some members of Congress, unlike in Lovett, there is no congressional finding of guilt in this case. In Lovett, a secret trial was held by Congress to determine the guilt or innocence of the accused subversives. Upon a finding of guilt, Congress passed the law denying the accused their salary for federal service. Thus, in Lovett, the congressional record was "unmistakably" clear as to Congress's intent to punish the subject individuals. Here, at most, there is the "smattering" of legislators' opinions regarding ACORN's guilt of fraud. See United States v. O'Brien, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores

of others to enact it."); cf. Selective Serv. Sys., 468 U.S. at 855–56 (upholding law denying federal financial assistance for higher education to male students who failed to register for the draft; in that case, as here, many legislators commented that the men who failed to register for the draft had committed a "felony, they have violated the law, and they are not entitled to these educational benefits"); BellSouth Corp., 162 F.3d at 690 (sustaining provision that placed special restrictions on Bell operating companies and dismissing a "few scattered remarks referring to . . . abuses allegedly committed by [Bell operating companies] in the past" as not providing the kind of "'smoking gun' evidence of congressional vindictiveness").

To be sure, a congressional finding following a legislative trial is not the only way to establish the "unmistakable evidence" of punitive intent in the legislative record; however, here, the statements by a handful of legislators are insufficient to establish — by themselves — the clearest proof of punitive intent necessary for a bill of attainder. Nor is the legislative record sufficient to demonstrate "punishment" cumulatively with the historical and functional tests of punishment analyzed above.

## III.    CONCLUSION

In accordance with the foregoing, the judgment of the District Court is affirmed in part and vacated in part. We remand for further proceedings as to the plaintiffs' First Amendment and due process claims.