19-2858-pr
*Reynolds v. Quiros, et al.*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2019

No. 19-2858-pr

RICHARD REYNOLDS,
*Plaintiff-Appellee*,

v.

ANGEL QUIROS, LEO ARNONE, EDWARD MALDONADO, GERARD GAGNE,
MARK FRAYNE, SCOTT SEMPLE, WILLIAM FANEUFF, in their Individual
and Official Capacities,
*Defendants-Appellants*.[*]

On Appeal from the United States District Court
for the District of Connecticut

ARGUED: MAY 13, 2020
DECIDED: MARCH 11, 2021

---

[*] The Clerk of Court is directed to amend the official caption to conform to
the above.

Before: KEARSE and CABRANES, *Circuit Judges*.[†]

Defendants-Appellants Angel Quiros, Leo Arnone, Edward Maldonado, Gerard Gagne, Mark Frayne, Scott Semple, and William Faneuff, who are current and former Connecticut Department of Correction officials, appeal from an August 27, 2019 judgment and permanent injunction entered in the United States District Court for the District of Connecticut (Stefan R. Underhill, *Chief Judge*) principally granting Plaintiff-Appellee Richard Reynolds' motion for summary judgment, and denying Defendants' motion for summary judgment. Reynolds, a prisoner serving a life sentence since 1999 in Connecticut's Northern Correctional Institution, brought the underlying action pursuant to 42 U.S.C. § 1983, alleging that the conditions of his confinement violate his rights under Article I, Section 10 (the Bill of Attainder Clause) of the Constitution, as well as the Eighth and Fourteenth Amendments of the Constitution. For the reasons we set forth below, we **AFFIRM IN PART** and **VACATE IN PART** the August 27, 2019 judgment of the District Court, **AFFIRM IN PART** and **VACATE IN PART** the August 27, 2019 permanent injunction,

---

[†] Judge Peter W. Hall, originally assigned to the panel, did not participate in consideration of this decision. The two remaining members of the panel, who are in agreement, have decided this case in accordance with Second Circuit Internal Operating Procedure E(b). *See* 28 U.S.C. § 46(d); *cf. United States v. Desimone*, 140 F.3d 457, 458 (2d Cir. 1998).

and **REMAND** the cause to the District Court for further proceedings consistent with this opinion.

Judge Kearse concurs fully in the opinion and judgment of the Court and also files a separate opinion.

––––––––––

BRETT DIGNAM (Sarah Hong Lin, Caleb King, and Mary Marshall, Law Students appearing under Local Rule 46.1(e), *on the brief*), Morningside Heights Legal Services Inc., New York, NY, *for Plaintiff-Appellee*.

STEVEN R. STROM, Assistant Attorney General (Clare Kindall, Solicitor General, and Madeline A. Melchionne, Assistant Attorney General, *on the brief*) *for* William Tong, Attorney General of Connecticut, Hartford, CT, *for Defendants-Appellants*.

––––––––––

JOSÉ A. CABRANES, *Circuit Judge*:

Defendants-Appellants Angel Quiros, Leo Arnone, Edward Maldonado, Gerard Gagne, Mark Frayne, Scott Semple, and William Faneuff (jointly, "Defendants"), who are current and former Connecticut Department of Correction officials, appeal from an August 27, 2019 judgment and permanent injunction entered in the

United States District Court for the District of Connecticut (Stefan R. Underhill, *Chief Judge*) principally granting Plaintiff-Appellee Richard Reynolds' ("Reynolds") motion for summary judgment, and denying Defendants' motion for summary judgment. Reynolds, a prisoner serving a life sentence since 1999, latterly in Connecticut's Northern Correctional Institution ("NCI"), brought the underlying action pursuant to 42 U.S.C. § 1983, alleging that the conditions of his confinement violate his constitutional rights under Article I, Section 10 (the Bill of Attainder Clause) of the United States Constitution,[1] as well as the Eighth[2] and Fourteenth[3] Amendments of the Constitution.

On appeal, Defendants challenge the District Court's grant of summary judgment, arguing that the District Court: (1) improperly made credibility determinations and decided triable issues of material facts that the parties dispute; (2) erred in concluding as a matter of law that Reynolds' conditions of confinement violate the Eighth

---

[1] "No State shall … pass any Bill of Attainder …." U.S. Const. art. I, § 10, cl. 1.

[2] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. *See Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (noting that the Eighth Amendment "applies to the States through the Fourteenth Amendment . . . and enjoins them from inflicting cruel and unusual punishments." (internal citation and quotation marks omitted)); *accord Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947) (plurality opinion) (holding that the Fourteenth Amendment incorporates the Eighth Amendment's protection from cruel and unusual punishment).

[3] "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, § 1.

Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment; and (3) erred in concluding as a matter of law that the Connecticut statute governing Reynolds' conditions of confinement is an unconstitutional "Bill of Attainder" under Article I, Section 10 of the Constitution.

Defendants also argue that the permanent injunction entered by the District Court is overly broad in violation of the Prison Litigation Reform Act,[4] and that the District Court erred in holding that Defendants were not entitled to qualified immunity.

We hold that the District Court erred by deciding disputed issues of material facts in granting summary judgment in Reynolds' favor. We affirm, however, the judgment of the District Court insofar as it concluded that Conn. Gen. Stat. § 18-10b is an unconstitutional bill of attainder, and that Defendants violated Reynolds' rights under the Equal Protection Clause of the Fourteenth Amendment.

## I. BACKGROUND

We draw the facts, which are largely undisputed except as specified below, from the District Court's August 27, 2019 Memorandum of Decision[5] ("MOD") and from the record before us.

---

[4] 18 U.S.C. §§ 3626(a)(1)(A), *et seq.*

[5] *See generally Reynolds v. Arnone*, 402 F. Supp. 3d 3 (D. Conn. 2019).

## A. Factual Background

Reynolds was convicted of the aggravated murder of Waterbury Police Officer Walter Williams and was sentenced to death in 1995. The Connecticut Supreme Court upheld Reynolds' sentence in 2003.[6] In 2012, the Connecticut Legislature adopted Conn. Gen. Stat. § 18-10b ("Section 18-10b"),[7] which abolished the death penalty prospectively and provided the terms and conditions of imprisonment to replace the death penalty for convictions for capital felonies, including confinement in a Special Circumstances Unit ("Special Circumstances

---

[6] *See generally State of Conn. v. Reynolds*, 264 Conn. 1 (2003).

[7] Section 18-10b provides in relevant part:

> (a) The Commissioner of Correction shall place an inmate on special circumstances high security status and house the inmate in administrative segregation until a reclassification process is completed under subsection (b) of this section, if (1) the inmate is convicted of the class A felony of murder with special circumstances committed on or after April 25, 2012, under the provisions of section 53a-54b in effect on or after April 25, 2012, and sentenced to a term of life imprisonment without the possibility of release, or (2) the inmate is in the custody of the Commissioner of Correction for a capital felony committed prior to April 25, 2012, under the provisions of section 53a-54b in effect prior to April 25, 2012, for which a sentence of death is imposed in accordance with section 53a-46a and such inmate's sentence is (A) reduced to a sentence of life imprisonment without the possibility of release by a court of competent jurisdiction, or (B) commuted to a sentence of life imprisonment without the possibility of release.

Unit").[8] In 2015, in a 4-3 decision, the Connecticut Supreme Court ruled that the death penalty was unconstitutional under the state constitution as applied to capital sentences already imposed.[9] Subsequently, in 2016, Reynolds was re-sentenced under Section 18-10b to life imprisonment without the possibility of release, and subject to the conditions of confinement prescribed by that statute.[10]

## B. Procedural History

Reynolds filed a *pro se* complaint in the District Court on October 4, 2013. Discovery was conducted and later reopened after counsel for Reynolds was appointed. On June 29, 2017, Reynolds filed a Second Amended Complaint (the "SAC"), which was followed by additional discovery. Both parties cross-moved for summary judgment on November 9, 2018, seeking judgment as a matter of law on all issues and claims presented by the pleadings.

On August 27, 2019, the District Court issued its MOD granting Reynolds' motion for summary judgment and denying Defendants' motion for summary judgment on qualified immunity and exhaustion grounds. The District Court concluded, *inter alia*, that the prison

---

[8] *See* App'x 561-565, Joint Local Rule 56(a) Statement of Stipulated Undisputed Facts (describing generally the conditions in the Special Circumstances Unit).

[9] *See State of Conn. v. Santiago*, 318 Conn. 1 (2015).

[10] *See Reynolds v. Comm'r of Correction*, 321 Conn. 750, 765 (2016) (affirming the judgment of the habeas court but vacating Reynolds' death sentence); *see also* Notes 7 and 8, *ante*.

officials at NCI "were aware of the mental health risks associated with prolonged isolation."[11] Accordingly, the District Court held that the officials "knew or reasonably should have known of the serious risks of harm to Reynolds from his conditions of confinement; [and] their failure to ameliorate those conditions reflects deliberate indifference" to such risks in violation of Reynolds' Eighth Amendment right to be free from cruel and unusual punishment.[12]

The District Court also entered judgment in Reynolds' favor on his due process claim regarding the so-called "classification hearings"—which prison officials conduct to make an individualized assessment of risks and needs of prisoners. In doing so, the District Court found that Defendants failed to provide even minimal due process protections, and that there was "no evidence in the record to suggest that Reynolds was provided any advance notice or an opportunity to be heard during his reclassification process pursuant to Section 18-10b."[13]

---

[11] *Reynolds*, 402 F. Supp. 3d at 21.

[12] *Id*. at 23. *But see Farmer v. Brennan*, 511 U.S. 825, 826-37 (1994) (In expressly rejecting a "purely objective test for determining liability—whether the risk is known or should have been known," the Court held that a prison official cannot be found liable for deliberate indifference under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety."). We do not comment further in this opinion on the District Court's legal analysis on Reynolds' Eighth Amendment claim. *See* Part II.D, *post*.

[13] *Id*. at 29.

The District Court also held that Reynolds had prevailed on his equal protection claims, concluding that, with respect to classifications that determine conditions of confinement, Reynolds was similarly situated to two other inmates, Terry Johnson ("Johnson") and Eduardo Santiago ("Santiago"), both convicted murderers formerly sentenced to death and now serving mandatory life sentences.[14] The District Court concluded that, with respect to his "Risk Level" and the conditions of the prison facility, Reynolds "arbitrarily" received a classification score of "5,"[15] whereas Johnson and Santiago received a "Level 4 Risk Level, which enables [Johnson and Santiago] to live among the general population at [MacDougall-Walker Correctional Institution]"[16] and avoid the harsh conditions that Reynolds endures [at NCI]."[17]

---

[14] *See id*. at 30-33.

[15] According to the Department of Correction's Classification Manual, "[a]ssignment to Administrative Segregation, Overall Risk Level 5, shall be considered when any totality of facts, information or circumstances . . . indicates an immediate threat to safety and/or security of the public, staff or other inmates." App'x 912.

[16] MacDougall-Walker Correctional Institution ("MacDougall") is a "high/maximum security level multi-mission facility for adult males . . . [that] provides a highly structured environment to manage long-term sentenced offenders, protective custody offenders and high bond unsentenced offenders with programs designed to address the needs of each population." *MacDougall-Walker CI*, CT.GOV, https://portal.ct.gov/DOC/Facility/MacDougall-Walker-CI (last visited November 12, 2020).

[17] *Reynolds*, 402 F. Supp. 3d at 33. In contrast to MacDougall, NCI is a "level five, maximum security institution . . . designated to manage those inmates who

Finally, the District Court ruled that Section 18-10b constitutes an unlawful bill of attainder because, *inter alia*, "Reynolds was not afforded a judicial trial regarding the punishment inflicted by Section 18-10b."[18] The District Court did not reach Reynolds' *ex post facto* claim,[19] and denied Defendants' claims that they are entitled to qualified immunity.[20]

As a remedy, the District Court entered a Permanent Injunction Order ("PIO") enjoining Department of Correction officials:

> (1) From placing Reynolds in ["]special circumstance[s] high security status;["]

> (2) From imposing on Reynolds the conditions of more than twenty-one hours per day alone in his cell, segregation from

---

have demonstrated a serious inability to adjust to confinement posing a threat to the safety and security of the community, staff and other inmates, are sentenced to death, or posses[s] a high bond . . . [that] provides a highly structured, secure and humane environment while affording inmates an opportunity through positive behavior and program participation to return to a less restrictive facility." *Northern CI*, CT.GOV, https://portal.ct.gov/DOC/Facility/Northern-CI (last visited March 10, 2021).

[18] *Id*. at 44.

[19] In his SAC, Reynolds also alleges that the "[e]nactment of [Section 18-10b] and Defendants' imposition of its punishment … violate[s] the ex post facto clause …" App'x 52. *See also* U.S. Const. art. I, § 10, cl. 1. ("No State shall … pass any … ex post facto law …."). *Accord Harisiades v. Shaughnessy*, 342 U.S. 580, 594 (1952) (Jackson, J.) ("It always has been considered that that which [the ex post facto provision] forbids is penal legislation which imposes or increases criminal punishment for conduct lawful previous to its enactment.").

[20] *See Reynolds*, 402 F. Supp. 3d at 38-39.

inmates who are not on special circumstances high security status, limitation of recreational activity to a maximum of two hours per day, and no-contact visitation;

(3) From enforcing Connecticut General Statutes Section 18-10b against any current or future inmate; [and further directing Defendants]

(4) [To] immediately, and at least every six months thereafter, provide Reynolds with a meaningful individualized classification determination using procedures that are the same or substantially similar to the procedures used for general population inmates; and

(5) [To] house Reynolds in conditions that are similar to those of [Johnson and Santiago] at the time [its] Order issued.[21]

In timely appealing, Defendants requested a stay of the PIO pending appeal. Judge Bianco granted a temporary stay on November 1, 2019, pending the decision on the stay motion by a three-judge motions panel, which granted the stay on January 7, 2020.[22]

## II. DISCUSSION

We review a grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in the non-movant's favor.[23]

---

[21] Sp. App'x 58-59.

[22] Sp. App'x 73; Dkt. No. 102 (Pooler, Hall, Lohier, *Circuit Judges*).

[23] *See Natofsky v. City of New York*, 921 F.3d 337, 344 (2d Cir. 2019).

### A. The District Court's Application of the Summary Judgment Standard

A district court may grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[24] In evaluating a motion for summary judgment, a district court may not make credibility determinations, or weigh evidence.[25]

We agree with Defendants that, in granting summary judgment to Reynolds, the District Court impermissibly decided disputed issues of material facts. Specifically, the parties vigorously disagree as to the precise conditions imposed in the Special Circumstances Unit in which Reynolds is housed, which in turn has bearing on whether the conditions may be properly characterized as "solitary confinement." This is relevant because if the imposed conditions did constitute solitary confinement, Reynolds could arguably prevail on his claims alleging violations of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. In its decision, the District Court focused on four "core" facts that it characterized as "undisputed":

---

[24] Fed. R. Civ. P. 56(a).

[25] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .").

[1] Reynolds is confined to his cell an average of 21 to 22 hours a day[;]

[2] He is unable to interact with other inmates in general population[;]

[3] He is unable to physically embrace his visitors[;]

[4] Other than his limited recreation time, professional or medical visits, and short fifteen-minute increments [sic] to eat and shower, Reynolds will spend the remainder of his life alone in a small cell.[26]

In their motion for summary judgment, however, Defendants included voluminous submissions purporting to show that the Special Circumstances Unit is not, nor even comparable to, "solitary confinement,"[27] and that any potential differences between the two are material facts that should be decided by a jury. For example, Defendants expressly dispute Reynolds' contentions that he is

---

[26] *Reynolds*, 402 F. Supp. 3d at 20.

[27] In their brief on appeal, Defendants describe what they characterize as conditions of "true solitary confinement" as found in *Wilkinson v. Austin*, 545 U.S. 209, 214 (2005), in which the supermax facility in question required "meals in the cells, no communications by and between inmates, no recreation within the cells, perpetual lights on in the cells and only one hour a day outside of the cell." Appellant's Br. at 63. Defendants contend that these conditions are not comparable to those at NCI. Defendants also rely on the expert report of Dr. Gregory Saathoff, a prison psychiatrist which concluded that the conditions of the Special Circumstances Unit did not constitute "solitary confinement"—a conclusion based on comparisons to conditions imposed in other maximum-security prisons and correctional facilities. *See* App'x 272-92.

13

"confined to his cell an average of 21 to 22 hours a day," and that "other than limited recreation time, professional or medical visits, and short fifteen-minute increments [sic] to eat and shower … Reynolds will spend the remainder of his life alone in a small cell."[28] In our view, the declarations of Angel Quiros[29] and Gregorio Robles[30] contesting Defendants' assertions raise triable issues of fact.

Accordingly, the District Court erred in granting summary judgment in favor of Reynolds as to his Eighth Amendment and Fourteenth Amendment Due Process claims because material facts remain in dispute.

---

[28] Appellee's Br. at 17; Appellant's Br. at 19-21.

[29] *See* App'x 118-19, Declaration of District Administrator Angel Quiros (stating that, when Quiros was warden from July 2009 to July 2011, death row inmates at NCI "were never held in solitary confinement" because, *inter alia*, "[w]hen they went out to recreation, they would be alone in a single controlled exercise area . . . but they could talk to other inmates who were also out for recreation at the same time"; death row inmates "could have social visits … as well as social phone calls"; and that Quiros "added weekend recreation to the schedule for death row inmates" in order to "increase[] the opportunity for [their] out-of-cell-time").

[30] *See* App'x 155, Declaration of Captain Gregorio Robles, Unit Manager (stating that "[i]nmates classified as special circumstances high security could send and receive mail to and from outside [NCI]"; "[i]nmates classified as special circumstances high security are no longer placed in restraints when they leave their cells"; "special circumstances high security inmates may interact with one another[,] … can play cards or board games[,] … [and] can make telephone calls or read books"; "special circumstances high security inmates have multiple opportunities each day to interact, face to face, with staff and other inmates assigned to this unit").

14

## B. Bill of Attainder

The question of whether Section 18-10b constitutes a bill of attainder does not appear on this record to raise any facts in dispute. Accordingly, we review the decision for errors of law, and we do so *de novo*.

The Supreme Court has described a "bill of attainder" as "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial."[31] And the Bill of Attainder Clause in Article I, section 10 of the Constitution, as defined by the Supreme Court, prohibits States from enacting such laws, just as Article I, section 9 prohibits Congress from adopting such legislation. "[T]he Supreme Court has identified three elements of an unconstitutional bill of attainder: (1) 'specification of the affected persons,' (2) 'punishment,' and (3) 'lack of a judicial trial.'"[32]

Defendants have interpreted Section 18-10b as applied to Reynolds to require that Reynolds be permanently placed on Special Circumstances Unit high security status without the possibility of release into the general prison population. The statute further requires that: (1) Reynolds be housed "separate from inmates who are not on special circumstances high security status"; (2) his "movements be

---

[31] *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 468 (1977).

[32] *ACORN v. United States*, 618 F.3d 125, 136 (2d Cir. 2010) (quoting *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 847 (1984)).

escorted or monitored"; (3) he be moved "to a new cell at least every ninety days"; (4) "at least two searches of [Reynolds'] cell each week"; (5) "no contact be permitted" during Reynolds' social visits; (6) he be "assigned to work assignments that are within the assigned [Special Circumstances Unit]"; and (7) he be "allowed no more than two hours of recreational activity per day."[33]

Relying upon a legislative record that is replete with references to Reynolds and ten other individuals who at that time were sentenced to death in Connecticut, the District Court held that Section 18-10b satisfies the three elements of an unconstitutional bill of attainder.[34] We consider each element in turn.

### 1. Specification of the Affected Persons

The Supreme Court has instructed that a law may be an attainder when it "singl[es] out … an individual for legislatively prescribed punishment … whether the individual is called by name or

---

[33] *See* Conn. Gen. Stat. § 18-10b(c)(1)(B), (C).

[34] Legislators gave heightened attention to two of the ten other individuals: the "much reviled perpetrators of the widely publicized 2007 home invasion and murder of three members of Cheshire's Petit family." *Santiago*, 318 Conn. at 116. Indeed, the "public outrage at the perpetrators in the Cheshire case in particular was a primary reason the [provision] was drafted to retain the death penalty retroactively." *Id*. at 117 n. 108 (collecting statements from legislators about the role of the Cheshire case in drafting the bill).

described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons."[35]

On its face, Section 18-10b applies to any "inmate … in the custody of the Commissioner of Correction for a capital felony committed prior to April 25, 2012, under the provisions of section 53a-54b in effect prior to April 25, 2012, for which a sentence of death is imposed."[36] There is evidence in the record indicating that the legislature was well aware that only eleven individuals could ever meet this description at the time of the provision's enactment.[37] And where, as here, "past activity serves as a point of reference for the ascertainment of particular persons ineluctably designated by the legislature for punishment, the Act may be an attainder."[38]

The explicit application of the statute only to inmates sentenced to death as of April 25, 2012 supports a finding that the statute, by reason of its identification of a closed category of persons, is arguably a bill of attainder. The fact that the statute does not mention the inmates by name is immaterial, for it mentions a category of persons

---

[35] *Communist Party of the United States v. Subversive Activities Control Bd.*, 367 U.S. 1, 86 (1961).

[36] Conn. Gen. Stat. § 18-10b(a).

[37] *See, e.g.*, 55 H.R. Proc., Pt. 4, 2012 Sess., p. 87 (statement of Rep. Cafero) ("Many people are making their decision on whether or not to vote for this [bill prospectively repealing the death penalty] because they are trusting that even if … it passes, those 11 animals on death row will die.").

[38] *Selective Serv. Sys.*, 468 U.S. at 847 (quotation marks and internal citation omitted).

defined only by reference to some pre-existing status. It is well settled that laws that target persons or groups by a revealing description, instead of by name, are equally impermissible under the Bill of Attainder Clause.[39] This is so because a requirement that the names of targeted individuals be in the law would be easy to circumvent, and would effectively undermine the protections of the Bill of Attainder Clause.

The Connecticut legislature abolished the death penalty prospectively in 2015 because there was not enough support to pass a full repeal—that is, to abrogate the death penalty in those cases where it had been imposed prior to enactment of the statute.[40] Legislators at the time recognized that there was no consistent method to distinguish between the eleven individuals then on death row and those who might receive the death penalty in the future.[41] The resulting

---

[39] *See United States v. Brown*, 381 U.S. 437, 461 (1956) (invalidating as an unlawful bill of attainder a law that punished the Communist Party by name and noting that it "was not uncommon for English acts of attainder to inflict their deprivations upon relatively large groups of people, sometimes by description rather than [by] name"); *Cummings v. Missouri*, 71 U.S. 277, 323 (1866) (Stephen J. Field, *J.*) (invalidating attainder laws penalizing large groups of former Confederate sympathizers and remarking that "these bills are generally directed against individuals by name; but they may be directed against a whole class").

[40] *See Santiago*, 318 Conn. at 68.

[41] *See, e.g.*, 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1054 (remarks of Rep. John Hetherington) ("It says that, prospectively, it operates to spare killers in the future but not a certain [eleven] who currently occupy death row. So it is a very curious moral position; that is, the morality changes depend[ing] upon when it's applied."); 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1306 (remarks of Rep. Ernest Hewett) ("If you are

legislative compromise directed that the eleven inmates then on death row would be singled out for especially restrictive conditions of confinement in the event that they thereafter received a reduced or commuted sentence.[42]

Defendants argue that Section 18-10b cannot be a bill of attainder because it did not expressly apply to Reynolds or the other death row inmates at the time it was enacted. But that argument appears to prove too much and elevates form over substance. To be sure, Reynolds became subject to Section 18-10b only after the Connecticut Supreme Court held that capital punishment violated the state constitution, regardless of the date of the imposition of the sentence of death—the very possibility that Section 18-10b anticipated

---

serious about innocent people being put to death, then wait until you have the votes for a total repeal .… You will not have my vote, but at least you would have done it the right way.”).

[42] *See* 55 H.R. Proc., 2012 Sess., p. 178 (remarks of Rep. Gerald M. Fox) (stating that Section 18-10b would further “restrict [the] incarceration” of the eleven people then sentenced to death, should those sentences be commuted, and “if they were no longer on death row,” they would be “limited to special circumstances high security status”). Several legislators specifically referred to Reynolds by name during these debates. *See, e.g.*, Conn. J. Standing Comm. Hearing, Jud. Pt. 8, 2012 Sess. p. 62 (statement of Rep. Adinolfi) (“I think I could bend … if we gave them solitary confinement for life. … You have Richard Reynolds, who is [convicted of] murdering Waterbury Police Officer Walter T. Williams.”); 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 224-25 (statement of Rep. Davis) (“I’d like to bring attention to one particular inmate on death row …[,] Richard Reynolds.”).

and intended to govern by its express terms.[43] Indeed, the fact that the state legislature contemplated that very contingency and singled out Reynolds and ten similarly-situated inmates for special treatment in the event that any of them avoided the death sentence easily meets the threshold test of "specification" required by the Bill of Attainder Clause.

## 2. "Punishment"

To determine whether a law directed at a readily identified party is punitive, courts look to three factors: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a [legislative] intent to punish.'"[44]

### i. Historical Test

As recently as 2010, we observed that "[t]he Supreme Court has recognized that certain types of [legislative] punishment are 'so disproportionately severe and so inappropriate to nonpunitive ends

---

[43] *See* Conn. Gen. Stat. § 18-10b(a) (the section applies only to an inmate who, *inter alia*, has had his sentence "reduced to a sentence of life imprisonment without the possibility of release by a court of competent jurisdiction").

[44] *Selective Serv. Sys.*, 468 U.S. at 852; *see also Consolidated Edison Co. of N.Y. v. Pataki*, 292 F.3d 338, 350 (2d Cir. 2002) ("[A] statute need not fit all three factors to be considered a bill of attainder; rather, those factors are the evidence that is weighed together in resolving a bill of attainder claim.").

that they unquestionably have been held to fall within the proscription of the [Bill of Attainder Clause].'"[45] These legislative punishments, when disproportionately severe as imposed, include death, imprisonment, confiscation of property, and prohibition from specified employments or vocations.[46]

Consistent with the history of the proscription of bills of attainder, Section 18-10b's restrictions are plainly punitive, as it directs the Commissioner of Correction to "house [special circumstances] inmate[s] in administrative segregation," which is Connecticut's most restrictive form of incarceration.[47]

### ii. Functional Test

We have likewise noted that "[t]he functional test of punishment looks to whether the challenged law, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes.'"[48]

Defendants argue that Section 18-10b lacks a punitive purpose because it was designed to prescribe the treatment of defendants

---

[45] *ACORN*, 618 F.3d at 136 (quoting *Nixon*, 433 U.S. at 473).

[46] *See id*.

[47] Conn. Gen. Stat. § 18-10b.

[48] *ACORN*, 618 F.3d at 138 (quoting *Nixon*, 433 U.S. at 475). *See also Kaspersky Lab, Inc. v. United States Department of Homeland Security*, 909 F.3d 446, 455 (D.C. Cir. 2018) (remarking that the functional test "invariably appears to be the most important of the three [tests]" and that it "provides an inferential tool; it does not

following elimination of a sentence of death. We are not persuaded by this argument, inasmuch as Section 18-10b did not eliminate Reynolds' death sentence, but rather, addressed the concern that Reynolds' capital sentence could be reduced or commuted at a future point. In setting forth the conditions of confinement that Reynolds would then face, the statute's primary purpose, in the view of Reynolds, was to newly punish him.[49]

---

impose an independent requirement" (internal citation and quotation marks omitted)).

[49] In their reply brief, Defendants argue for the first time—without any citation to the record—that Section 18-10b has legitimate non-punitive purposes, including "frequent cell searches and moving the inmate to a new cell every ninety days, [which] are reasonably related to legitimate penological objectives of reducing contraband and preventing escapes." Appellant's Reply Br. at 25.

This assertion is belied by the absence of any consideration of these objectives in the legislative history, which predominantly involved discussion of punishing Reynolds and the ten other death row inmates. *See* Notes 42-43, *ante* and accompanying text; *see also* Conn. J. Standing Comm. Hearing, Jud, Pt. 8, 2012 Sess., p. 93 (statement of Sen. Looney) ("I think that someone serving a sentence without the possibility of release should be subject to the harshest possible constitutional conditions that could be imposed on someone."); 55 S. Proc., Pt. 3, 2012 Sess., p. 154 (statement of Sen. Slossberg) ("The death penalty doesn't bring back the victims of their crimes. And we certainly can punish criminals and protect the public safety without it. But . . . don't get me wrong, these people have committed horrible crimes and they deserve to be punished. And with the amendment that was offered at the beginning of this debate [Section 18-10b], we will have a very severe punishment, a punishment so horrible at least one person chose to die instead."); 55 S. Proc., Pt. 3, 2012 Sess., p. 296 (statement of Sen. Prague) ("I did go to Northern and saw death row and saw how horrible it is there and spending life in prison without the possibility of parole on death row in a situation that is just like death row is very,

### iii. Motivational Test

The motivational test inquires "whether the legislative record 'evinces a congressional intent to punish.'"[50] We have held that "[t]he legislative record by itself is insufficient evidence for classifying a statute as a bill of attainder unless the record reflects overwhelmingly a clear legislative intent to punish."[51] We agree with the District Court that the legislative record in this instance overwhelmingly discloses an intent on the part of the legislature to punish Reynolds should his death sentence be commuted.[52]

---

very, very, severe punishment. So — and that was our Amendment [Section 18-10b]."); 55 S. Proc., Pt. 3, 2012 Sess., p. 306 (statement of Sen. Crisco) ("And while some would say doing this bill may be soft on crime, I'd just like to remind those, you know, those of you about Northern Prison, death row. To me, that is hell on earth. How one retains his sanity in an environment like that is incomprehensible. And the amendment that we approve tonight [Section 18-101)] . . . really presents to us, I believe, the right way to go."); 55 H.R. Proc., 2012 Sess., p. 162 (statement of Rep. Hovey) ("Madam Speaker, we've heard a lot of very eloquent debate today. And part of the conversation around the argument for the abolishment of the death penalty is that, one, life and imprison -- life in prison is actually worse or even more punitive than being put to death. But, for me, these individuals are the most vile in our society and because of their choices and their behaviors, they will have received Connecticut's maximum sentencing for prison[.]").

[50] *Selective Serv. Sys.*, 468 U.S. at 852 (quoting *Nixon*, 433 U.S. at 478).

[51] *ACORN*, 618 F.3d at 141 (noting that statements by only a "smattering of legislators" is insufficient to demonstrate punitive intent by the legislature).

[52] *See* Note 49, *ante* and accompanying text.

Under each of these three tests, we believe the statute was properly held to have been intended to punish.

### 3. Lack of a Judicial Trial

Reynolds argues that Section 18-10b imposes punishment without a judicial trial. But for Section 18-10b, Reynolds would still be subject to life imprisonment without the possibility of release while eligible for transfer from the Special Circumstances Unit into the general prison population.[53]

Defendants argue that Reynolds received a trial because he "was sentenced to death after a full trial, and that conviction was upheld after habeas challenges."[54] Reynolds, however, did not receive a trial for the additional punitive measures that the legislature imposed on April 25, 2012, when it eliminated the possibility that Reynolds could ever be released from the Special Circumstances Unit in the event his death sentence was reduced to life imprisonment.

At the time of Reynolds' conviction, a permanent and unreviewable assignment to the Special Circumstances Unit was not a punishment provided for by the laws of Connecticut. His sentence was

---

[53] We assume without deciding that assignment to "general population" is preferable to indefinite confinement to the single-cell arrangement of a "supermax" facility such as NCI. *But see* Notes 58 and 67, *post*.

[54] Appellants' Br. at 47.

governed by Connecticut General Statute § 53a-46b, as amended by Public Act 85-366, which provides in relevant part:

> If the jury or, if there is no jury, the court finds that none of the [aggravating] factors … exists or that one or more mitigating factors exist, the court shall impose a sentence [in accordance with subsection 1 of Connecticut General Statute § 53a-35a] of life imprisonment without the possibility of release. [55]

Section 53a-35a imposed "a term of life imprisonment without the possibility of release unless a sentence of death is imposed."[56] Section 18-10b thus compels a form of severe confinement that was not available to anyone at the time of Reynolds' offense and trial—namely, confinement in indefinite and unreviewable isolation without the possibility that Reynolds could ever be housed in the general prison population.[57] Because the punishment imposed on Reynolds was not available at the time his guilt was initially determined and after it

---

[55] Connecticut Gen. Stat. § 53a-46b

[56] *Id*. § 53a-46b

[57] *But see* Note 53, *ante*, and Note 67, *post*.

became available it was imposed without a trial, we cannot say that he was afforded a judicial trial in connection with his punishment.[58]

* * *

When applied to Reynolds, Section 18-10b thus meets all of the requisite criteria for an unlawful bill of attainder.

## C. Equal Protection

The District Court granted summary judgment to Reynolds on his claim that his conditions of confinement, when compared to those of similarly-situated inmates, violate his rights under the Equal Protection Clause of the Fourteenth Amendment. To prevail on an equal protection claim, "a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination."[59] The disparity in treatment must survive the appropriate level of judicial scrutiny which, in the

---

[58] Our conclusion on this point is informed by our view that the relevant question is not whether the punishment imposed by Section 18-10b was imposed subsequent to some judicial trial, but rather, whether the punishment was imposed after a judicial trial at which the punished individual had an opportunity to challenge the punishment. While this unique legislative approach has not been considered by other courts, it embodies the type of harm that the Bill of Attainder Clause seeks to avoid.

[59] *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005).

context of a prison, is that the difference in treatment was not reasonably related to any "legitimate penological interests."[60]

Reynolds does not allege that Defendants treated him differently because he belonged to a protected class, but rather, rests on a "class of one" theory, which requires Reynolds to show that he has been "intentionally treated differently from others similarly-situated and that there is no rational basis for the difference in treatment."[61] Specifically, Reynolds contends that his assignment of an unreviewable Risk Level 5 was arbitrary, inasmuch as two similarly-situated prisoners, Santiago and Johnson, were assigned classification of Risk Level 4, which permits them to live in the general population.[62]

We agree with the District Court that Santiago and Johnson are similarly situated to each other, and that, in turn, Reynolds' individual circumstances have the requisite high degree of similarity to the two of them.[63] Notably, all three prisoners: (1) were convicted of murder and initially sentenced to death; and (2) after their sentences of death were reversed, were resentenced to life in prison without the

---

[60] *Id.*

[61] *Village of WIllowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (requiring an "extremely high degree of similarity" between the plaintiff and those similarly situated).

[62] *See* App'x 610 (Affidavit of Eduardo Santiago); App'x 617 (Affidavit of Terry D. Johnson).

[63] *See Reynolds*, 402 F. Supp. 3d at 30-33 (discussing the factual backgrounds of Santiago and Johnson).

possibility of release.[64] In addition, both Santiago and Johnson have records of fighting guards and other inmates, while Reynolds has no violent disciplinary history. We see no rational basis for the Department of Correction's classification of Reynolds at Risk Level 5 while Santiago and Johnson are classified at Level 4.[65]

We are not persuaded by Defendants' sole proffered explanation for this discrepancy—namely, that unlike Reynolds,

---

[64] *See State of Conn. v. Santiago*, 318 Conn. 1 (2015). We acknowledge that the cases of Johnson and Santiago are not identical in all respects to that of Reynolds. *See State v. Johnson*, 253 Conn. 1, 56, 81-82 (2000) (reversing judgment imposing death penalty and remanding with instructions to impose a sentence of life imprisonment without the possibility of release because "the evidence adduced at trial did not support the jury's finding of an aggravating factor"); *State v. Santiago*, 318 Conn. 1, 10, 85 (2015) (explaining that while Santiago's conviction was affirmed, his sentence of death was initially reversed and remanded for a new penalty phase hearing on the ground that he had been deprived of the opportunity to review and use certain potentially mitigating evidence; but, after the passage of Section 18-10b, on reconsideration, Santiago's sentence of death was reversed and remanded with direction to sentence the defendant to life imprisonment without the possibility of release). But we have not held that comparators must be identical; rather, that "a plaintiff must show an extremely high degree of similarity between itself and its comparators." *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 198 (2d Cir. 2019) (internal quotation marks omitted); *see also Fortress Bible Church v. Feiner*, 694 F.3d 208, 221 (2d Cir. 2012) (rejecting defendant's argument that plaintiff's equal protection claim failed "because the [plaintiff] has not provided a single comparator situated similarly to it in all respects").

[65] *See* App'x 1043 (Declaration of Carol Guerrero attaching Santiago's disciplinary records); App'x 1110 (Declaration of Ruth O'Herron attaching Johnson's disciplinary records); App'x 569, Reynolds's Local Rule 56(a)(1) Statement of Material Facts (stating that Reynolds did not incur any disciplinary infractions between 1998 and 2010, and Reynolds has never been cited for a disciplinary infraction as a result of violent or aggressive behavior).

Santiago and Johnson were not "convicted of aggravated capital murder of a police officer, in a manner that was especially cruel and heinous."[66] Santiago was convicted of murdering a sleeping victim in the victim's home after being hired by a third party to carry out the killing, and Johnson was convicted of the murder of a Connecticut State Trooper during the commission of a burglary.[67] We assume for the argument that the comparative heinousness of each prisoner's offenses may, in some circumstances, factor into a particular equal protection analysis, but we see no differences between the underlying crimes of conviction in the instant case sufficient to justify discrepant treatment.

We conclude that Reynolds is similarly situated to Santiago and Johnson, and because Defendants do not offer a persuasive explanation as to why Reynolds is treated differently (particularly given his lack of violent infractions compared to Santiago and Johnson), we conclude that Defendants' classification of Reynolds as Risk Level 5 violated his equal protection rights.

### D. Defendants' Remaining Challenges on Appeal

In vacating the judgment and the preliminary injunction of the District Court on these grounds—namely, that the District Court decided disputed issues of material facts in granting summary

---

[66] Appellant's Br. at 37.

[67] *See Santiago*, 318 Conn. at 86; *State of Conn. v. Johnson*, 253 Conn. 1, 4-5 (2000).

judgment to Reynolds—we express no view on the remaining arguments raised by Defendants on appeal, specifically, their challenges to the District Court's conclusions regarding whether Reynolds' conditions of confinement violate the Eighth Amendment, or the Due Process Clause of the Fourteenth Amendment; whether the District Court's permanent injunction violated the Prison Litigation Reform Act; and whether, in the circumstances presented here, Defendants are entitled to qualified immunity.

## III. CONCLUSION

In closing, we note with interest Defendants' suggestion that Reynolds does not wish to be moved into general population, given his preference for a single cell.[68] Our holding does not suggest, much less require, that after further review of Reynolds' situation, Reynolds' own preferences should be disregarded.

To summarize, we hold as follows:

(1) The District Court erred by deciding disputed issues of material fact in granting summary judgment in favor of

---

[68] *See* App'x 2230, August 30, 2019 Declaration of NCI Warden Giuliana Mudano (stating that she has spoken with Reynolds following the entry of the injunction, and that Reynolds told her he would prefer to keep his single cell). *But see* App'x 1799, Reynolds's Local Rule 56(a)(2) Statement of Material Facts (stating, *inter alia*, that he had "made his complaints about conditions clear through written Inmate Request forms," and that he had "never discussed his single cell status with Defendant Quiros and he made it clear in numerous grievances that he was not 'satisfied' with his conditions on death row"). *See also* Notes 53 and 57, *ante*.

Reynolds on his claims under the Eighth Amendment, and the Due Process Clause of the Fourteenth Amendment;

(2) The District Court correctly concluded that, with respect to Reynolds, Conn. Gen. Stat. § 18-10b is an unconstitutional bill of attainder; and

(3) Reynolds' unreviewable classification score of Risk Level 5 violates his rights under the Equal Protection Clause of the Fourteenth Amendment because the difference in his treatment compared to that of other similarly-situated inmates lacks a rational basis.

For the foregoing reasons, we **AFFIRM IN PART** the August 27, 2019 judgment of the District Court, insofar as it held that Conn. Gen. Stat. § 18-10b is an unconstitutional bill of attainder and that Defendants violated Reynolds' equal protection rights by arbitrarily assigning him an unreviewable Risk Level 5; we **VACATE** the August 27, 2019 judgment in all other respects; **AFFIRM IN PART** the August 27, 2019 permanent injunction with respect to its provisions: (1) enjoining DOC from enforcing Section 18-10b in Reynolds' case; (2) directing DOC to house Reynolds in conditions similar to those of Johnson and Santiago; and (3) requiring DOC to provide Reynolds with a meaningful individualized classification determination; **VACATE** the August 27, 2019 permanent injunction in all other respects; and **REMAND** the cause to the District Court for further proceedings consistent with this opinion.

19-2858
Reynolds v. Quiros,

KEARSE, *Circuit Judge*, concurring:

Previously we have acknowledged that generally, a prisoner's contention that his conditions of confinement violate the Eighth Amendment requires an analysis involving both objective and subjective factors. *See Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002); *see, e.g., Farmer v. Brennan*, 511 U.S. 825, 834 (1994). While I concur fully in Judge Cabranes's opinion, I write separately to offer a brief thought--which has no immediate bearing on our disposition in this case--on the applicability of the subjective factor.

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). Generally a prisoner's challenge to his conditions of confinement on the basis that the conditions constitute cruel and unusual punishment in violation of the Eighth Amendment requires a two-step analysis. *See, e.g., Farmer*, 511 U.S. at 834. First, a prisoner must show that, because of his conditions of confinement, he is deprived of a "basic human need[]," including "food, clothing, shelter, medical care, and reasonable safety." *Helling*, 509 U.S. at 32 (internal quotation marks omitted). Risk of future harm from unsafe conditions can meet this

"objective prong" of an Eighth Amendment violation. *Id.* at 33-35. Second, he must show that prison officials were deliberately indifferent to a risk to his health and safety, which the Court has defined as knowing and disregarding an excessive risk to inmate health or safety. *See Farmer*, 511 U.S. at 834-37.

The Court has explained that the source of the deliberate indifference standard is "the Eighth Amendment itself, which bans only cruel and unusual *punishment*." *Wilson v. Seiter*, 501 U.S. 294, 300 (1991) (emphasis in original). "If the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." *Id.* (emphasis in original). Despite the implicit limitation that the inquiry into a prison official's state of mind applies only to claims challenging conditions of confinement that do not implicate statutorily required conditions, courts have generalized the application of the deliberate indifference requirement to all conditions of confinement. *See, e.g.*, *Helling*, 509 U.S. at 32 ("*Wilson v. Seiter* . . . held that a claim that the conditions of a prisoner's confinement violate the Eighth Amendment requires an inquiry into the prison officials' state of mind."). To be sure, it is likely that most conditions-of-confinement claims will arise in the context of prison officials performing (or not performing) discretionary management duties; but where the

challenged conditions are explicitly prescribed by statute, I do not see the rationale for an inquiry into an official's mental state, nor do I read the caselaw to require one.

The conditions challenged by Reynolds are unique in that they are imposed by Conn. Gen. Stat. § 18-10b and are thus "formally meted out as punishment by the statute." *Wilson v. Seiter*, 501 U.S. at 300 (emphasis omitted). Such conditions being required by statute, I do not think any Eighth Amendment challenge necessitates a showing of deliberate indifference. *See id.* at 306 (White, J., concurring ("It is well established, and the majority does not dispute, that pain or other suffering that is part of the punishment imposed on convicted criminals is subject to Eighth Amendment scrutiny without regard to an intent requirement.")).